UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ASHLEY DEWANDA BRADLEY
OBO K.J.B., a minor child,
        Plaintiff,

vs.                                             Case No.: 1:20cv118/AW/EMT

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]
        Defendant.
_____/

# REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules of this court 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act (Act). The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security (Commissioner) determining that Plaintiff's minor son—previously determined to be disabled as of April 22, 2013—was no longer disabled as of August 14, 2017. Upon review of the record before the court, the undersigned concludes the findings

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is automatically substituted for Andrew M. Saul as the Defendant in the case.

of fact and determinations of the Commissioner are supported by substantial evidence and application of proper legal standards and that the Commissioner's decision, therefore, should be affirmed.

## ISSUES ON REVIEW

Plaintiff Ashley Dewanda Bradley (Plaintiff), on behalf of her minor son K.J.B. (Claimant), alleges Claimant continues to suffer from attention deficit hyperactivity disorder (ADHD), learning disabilities, and a speech impairment—and that these disorders meet or functionally equal the criteria of Listing 112.11 (20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11). Plaintiff also claims the ALJ erred in finding Claimant had less than a marked limitation in attending and completing tasks.

## PROCEDURAL HISTORY

Plaintiff filed an application for Child's SSI on April 22, 2013, alleging Claimant was disabled as of March 1, 2013 (tr. 134, 321–26).[2] On November 18, 2013, the Commissioner issued a decision finding Claimant disabled as of April 22,

---

[2] The administrative record, as filed by the Commissioner, consists of 1,085 consecutively numbered pages (ECF No. 12). References to the record will be by "tr.," for transcript, followed by the page number. The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

2013, because he had marked limitations in (1) attending and completing tasks, and (2) interacting and relating with others (tr. 140–41). The Commissioner subsequently conducted a continuing disability review and determined Claimant's disability ceased on August 14, 2017 (tr. 147–66). Plaintiff requested reconsideration, and the determination was upheld after a hearing by a disability hearing officer (tr. 179–208). Plaintiff sought review by an administrative law judge (ALJ) (tr. 209–13). The ALJ held hearings on October 1, 2018, and May 20, 2019 (tr. 80–98, 99–124). On June 25, 2019, the ALJ issued an unfavorable decision, finding Claimant's disability ended as of August 14, 2017, when Claimant was nine years old (tr. 8–28). Plaintiff requested review by the Appeals Council, which denied the request on March 16, 2020 (tr. 1–3, 316–19). The ALJ's decision thus became the final determination of the Commissioner, and that determination is now ripe for review.

## FINDINGS OF THE ALJ

In his written decision of June 25, 2019, the ALJ made a number of findings relative to the issues raised in this appeal, including the following:

- The most recent favorable medical decision finding Claimant disabled is the determination dated November 18, 2013, which is the "comparison point decision" (CPD) (tr. 14).

- At the time of the CPD, Claimant had the following medically determinable impairments: ADHD and a speech and language disorder. These impairments were found to functionally equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924(d), 416.926a) (*id.*).

- Medical improvement occurred as of August 14, 2017 (20 C.F.R. § 416.994a(c)) (tr. 15).

- Claimant was born on March 5, 2008, and was a school-age child as of August 14, 2017, and at the time of the ALJ's decision (20 C.F.R. § 416.926a(g)(2)) (tr. 16).

- The impairments Claimant had at the time of the CPD have not functionally equaled the Listings since August 14, 2017 (20 C.F.R. §§ 416.994a(b)(2), 419.926a, and SSR 05-03p) (*id.*).

- The medical and other evidence establish that Claimant: (1) did not have an impairment at the CPD that was not considered at that time, and (2) has not developed any additional impairments subsequent to the CPD (tr. 25).

- Since August 14, 2017, Claimant has not had an impairment or combination of impairments that meets, medically equals, or functionally equals a listed impairment (20 C.F.R. §§ 416.925, 416.926, 416.924(d), 416.926a) (tr. 25, 27).

- Claimant's disability ended as of August 14, 2017, and Claimant has not been disabled since that date (20 C.F.R. § 416.994a) (tr. 28).

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v.*

*Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence in the record. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great

deference to the ALJ's factfindings.") (citing *Black Diamond Coal Min. Co. v. Dir.,*

*Office of Workers' Comp. Program, U.S. Dep't of Labor*, 95 F.3d 1079, 1082 (11th

Cir. 1996)).  A reviewing court also may not look "only to those parts of the record

which support the ALJ" but instead "must view the entire record and take account

of evidence in the record which detracts from the evidence relied on by the ALJ."

*Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Review is deferential to

a point, but the reviewing court conducts what has been referred to as "an

independent review of the record."  *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir.

1985).[3]

## FACT BACKGROUND[4]

Claimant, born on March 5, 2008, was five years old on the disability onset

date.  On February 6, 2017, when Claimant was almost nine years old, the Alachua

County School District implemented an Individual Education Plan (IEP) to address

his curriculum/learning environment, independent functioning, and communication

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

[4] The recitation of facts set forth below is derived from testimony at the hearings before the ALJ and the administrative record and is limited to facts bearing on the issues Plaintiff raises on appeal.

(tr. 738). The goal of the IEP was to have Claimant reach grade level in sentence skills and math, with assignments and tests to be "administered in a small group setting of a size comparable to the normal instruction group size (Small group of up to ten students)" (tr. 742). The team determined Claimant did not require Extended School Year services, and it requested no "unique accommodations" (tr. 742–43).

According to the IEP, Claimant was making satisfactory grades and had an improved work ethic but difficulty grasping some math concepts and determining the questions addressed in word problems (tr. 738, 740). The IEP indicated Claimant's condition impaired his ability to effectively and efficiently complete verbal messages when speaking with adults and peers (tr. 739). There was concern regarding Claimant's social skills, but the IEP did not address social or emotional behavior because Claimant's behavior did not impede his or others' learning (tr. 737–38).

On August 8, 2017, Claimant's teacher, Brooke Teele, completed a Teacher Questionnaire (tr. 389–96). Ms. Teele indicated Claimant had some problems attending and completing tasks, explaining that "[w]hen given direct instruction speaking straight to [Claimant], he is able to understand and complete tasks without a problem" and that "[p]roblems typically occur[ed] when [a] task [was] difficult or [Claimant was] required to work independently for too long" (tr. 391). Ms. Teele

stated Claimant had an "an obvious problem" on a daily basis completing work accurately and without careless mistakes and working without distracting himself or others (*id.*).    She also indicated Claimant had a problem expressing anger appropriately, which occurred on a weekly basis (tr. 392).  She explained Claimant "sometimes ha[d] an issue getting his anger under control, but this was not something that we dealt with regularly.  He would have this issue a few times a month." (tr. 394).  The problem apparently resolved over the course of the school year, as Ms. Teele stated that "[w]hen [Claimant] first [entered her] class [she] had to do hourly behavior checks, but by the end of the year [Claimant] was on a normal schedule" (tr. 392).

On July 25, 2017, Virginia Dixon-Wood, SLP, prepared a Speech and Language Evaluation Report (tr. 764–71).    According to Ms. Dixon-Wood, Claimant, who was nine years old at the time, had difficulty organizing words to make appropriate sentences but was able to describe different meanings of words (tr. 764, 767).  Testing revealed below average scores in sentence combining, word ordering, and relational vocabulary and average scores in picture vocabulary, morphological comprehension, and multiple meanings (tr. 768).  Claimant's scores on all composite tests, including listening, organizing, speaking, grammar, semantics, and spoken language, were below average (*id.*). Testing showed

Claimant's articulation was not developmentally appropriate or dialectal but that his intelligibility was ninety-eight to100 percent (tr. 770).

Less than one month later, on August 17, 2017, Brandon Sapp, SLP, prepared a Speech Language Pathology Evaluation due to Plaintiff's concerns regarding Claimant's stutter (tr. 777–78). According to the report, Plaintiff advised Mr. Sapp that Claimant began stuttering at the age of three but Claimant was not "really bothered by his stuttering" (tr. 777).

Mr. Sapp assigned Claimant a moderate disfluency rating with consistent prolongation, blocks, and repetitions (tr. 779). Claimant scored under the first percentile on speech fluency tasks and observational rating and in the seventh percentile on a disfluency-related consequences test (tr. 778–79). Treatment notes indicate both short- and long-term goals were established, to be accomplished within 180 days of treatment (tr. 779–80). Mr. Sapp indicated Plaintiff had no special needs and that Claimant's potential for rehabilitation was "[f]air," with family/caregiver support expected to impact the outcome (tr. 780). Claimant was to participate in speech therapy until both short- and long-terms goals had been met or were being independently reached or until maximum benefit had been achieved (tr. 781).

On September 18, 2017, Claimant saw Alison Boothby, ARNP, for ADHD (tr. 895). Plaintiff reported Claimant's medication regimen was working and that

Claimant was in speech therapy (*id.*). Ms. Boothby referred Claimant to occupational therapy to work on handwriting (tr. 898). She also prescribed Adderall and Vyvanse for ADHD (*id.*).

On September 27, 2017, Claimant received detention at school for yelling at a teacher and fighting with a student (tr. 423). On October 17, he was suspended from bus services for fighting (tr. 422). On November 29, he argued with several students and exhibited a rude and defiant tone when talking to a teacher and refusing to complete classwork (tr. 425). According to a report of the incident, "[i]f a student would walk by [Claimant's] desk [Claimant] would yell at them for getting to [sic] close to him" (*id.*). Claimant met with the Behavioral Resource Teacher (BRT) to "try to give him a reset," at which time Claimant kicked the desk in anger and threw his papers and jacket on the floor (*id.*). An hour later, Claimant had to be removed from class again for yelling at other students and a teacher (tr. 425). And Claimant was again suspended from bus services on November 30 after he hit other students with his hat, yelled at students, and acted defiantly toward the bus driver (*id.*).

When Claimant saw Ms. Boothby on October 18, 2017, Plaintiff reported Claimant's medication regimen was no longer controlling the targeted behaviors and Claimant was not doing well at school (tr. 987). Specifically, Plaintiff indicated Claimant had difficulty focusing and paying attention and had recently become more

emotional (tr. 988). Plaintiff also indicated other students were bullying Claimant because of his stutter and that Claimant was "getting into altercations with other students" (*id.*). Under the heading "Progress Since Last Visit," however, Ms. Boothby noted Claimant's target behaviors were well controlled, his school performance was maintained, and Claimant slept through the night (*id.*). She also indicated Claimant was "an alert, well appearing, and cooperative child" (*id.*). Claimant engaged in no unusual activity during the visit but demonstrated developmental delays (tr. 989). Ms. Boothby diagnosed ADHD, referred Claimant to pediatric psychology, and increased the dosage of Vyvanse (*id.*).

On November 21, 2017, occupational therapists Haley Pope and Jacqueline Memminger evaluated Claimant for handwriting therapy (tr. 802–06). The therapists noted delays in multiple areas, which they opined could impact Claimant's ability to participate independently and successfully in school, home, and community environments (tr. 804). They recommended occupational therapy (*id.*).

The same day, Jennifer Bartolotti and Andrea Van Boven, speech language pathologists, performed a speech-language evaluation due to Plaintiff's concerns about Claimant's stutter (tr. 807). Plaintiff's behavior was within normal limits, as was his articulation/phonology, expressive language, and receptive language, but his fluency was impaired (tr. 807–08). Based on a standardized assessment, parent

report, and clinician observation, the clinicians determined Claimant met the "diagnostic criteria for Childhood Onset Fluency Disorder (F80.81)" and "recommended that [Claimant] receive skilled speech-language services in order to address . . . deficits and facilitate improvement in these areas to a level more commensurate with that of [Claimant's] age-matched peers" (*id.*).

Claimant saw Timothy Foster, M.D., on January 8, 2018, for follow-up regarding ADHD (tr. 913). Dr. Foster noted that since Claimant's last visit, Claimant's behavior had improved and Claimant continued to take Vyvanse and Adderall (*id.*). Review of systems was positive for ADHD, behavior problems, and learning difficulty and negative for abusive relationship, aggressive behavior, bipolar, and depression (tr. 913). Dr. Foster indicated Claimant was to attend a "psychology appointment" (tr. 914).

Two days later, on January 10, 2018, Plaintiff reported to Ms. Boothby that Claimant's ADHD symptoms were controlled with medication (tr. 992). Ms. Boothby found Claimant developmentally normal for his age (tr. 994).

On January 22 and 23, 2018, non-examining state agency consultants Iris Eisenberg, M.D., and Jessy Sadovnik, Psy.D., completed a Childhood Disability Evaluation Form (tr. 785–86). The consultants opined Claimant had less than marked limitations in acquiring and using information, attending and completing

tasks, and interacting and relating with others and no limitations in moving about and manipulating objects, caring for oneself, and health and physical well-being (tr. 787–88).

With regard to acquiring and using information, the consultants noted Plaintiff reported "some problems with learning skills, particularly in writing and understanding money," and that Claimant had an IEP and received speech therapy once a week (tr. 787). The consultants also noted Claimant passed all subjects in school, had no history of retention or other learning problems, and that while there was no current learning disability testing, there was no evidence to suggest such testing would reveal a marked limitation (*id.*). Based on the totality of the evidence of record, the consultants concluded Claimant had, at most, a moderate limitation in acquiring and using information (*id.*).

In the area of attending and competing tasks, the consultants noted Claimant had previously been determined to have a marked limitation (tr. 787). The consultants also noted, however, that Plaintiff was "reporting only ADHD" and that Claimant was taking prescribed medication "with what appear[ed] to be positive management of associated symptoms" (*id.*). Plaintiff reported "[s]ome problems with completing chores and homework," and the evaluators observed "some restlessness and distractibility" during structured testing, noting Claimant's IEP

focused on Claimant being able to complete work without distraction (*id.*).  Again, however, based on the totality of the evidence of record, the evaluators concluded that, at most, Claimant had a moderate limitation in attending and completing tasks (*id.*).

With regard to Claimant's ability to interact and relate with others, the consultants noted that at the time of the evaluation (January 2018), Claimant had "just finished participating in football," "play[ed] with friends appropriately," "play[ed] with toys and might play with video games for an hour," had no behavior problems at school, and "listen[ed] at home some of the time" (tr. 787).  "Pragmatics during testing [were within normal limits]" (*id.*).  The evaluators noted "[c]redibility of familiar listener" and that Claimant's teacher complained of disruptive behavior only when Claimant did not take his medication (*id.*).  They concluded the "totality of the evidence [did] not suggest any severe problems from a mental perspective" in Claimant's ability to interact and relate with others (*id.*).

The school district implemented another IEP on January 30, 2018, when Claimant was in the fourth grade (tr. 793–99).  According to the IEP, when focused, Claimant was able to "utilize slow-easy speech strategies to reduce his disfluency," but he did "not utilize strategies during general conversation with peers and adults" and "require[d] max cues to utilize strategies although when focused he [was] able

to demonstrate use" (tr. 796).  The team noted Claimant's "disfluency hinder[ed] the smoothness of his speech making communication with peers and adults difficult," "[Claimant]'s disability hinder[ed] his progress in grade level curriculum," and "[Claimant] [had] trouble staying focused and on task so he need[ed] to have extended time on tests, frequent breaks, oral presentation of directions, and having test questions and answer choices read to him" (tr. 796–97).  Nevertheless, Claimant was "able to follow the rules of punctuation and capitalization 75% of the time, with verbal/visual prompts and use of self-editing check list," and "demonstrate[d] legible letter formation, adequate spacing between words, and on line placement, with verbal prompting to slow down and focus on task in 2 out of 4 trials" (tr. 796).  Claimant was "a hard worker when focused and . . . able to answer comprehension questions with 70% accuracy in 4 out of 5 attempts" (tr. 797).  But he was "performing below grade level in math and reading," and his "decreased visual perceptual/motor skills affect[ed] his ability to place letters on line, and to attend to error in sentence skills" (tr. 796).  It also was "difficult for [Claimant] to focus on assigned task and complete work in a timely manner, with distractions occurring within the environment" (*id.*).  Because "[Claimant] [was] easily distracted and work[ed] well in small groups," the team determined Claimant "need[ed] to be in a

small group setting to limit distractions when receiving instruction or taking assessments" (tr. 797).

According to a February 15, 2018, disciplinary report, Claimant punched a student in the face, poked the student in the eye, and repeatedly punched the student in the abdomen because the student reported Claimant for using profanity (tr. 427).

On March 13, 2018, Nancy Powers, another speech language pathologist, and Andrea Van Boven evaluated Claimant (tr. 810). Plaintiff reported Claimant had been receiving speech therapy for stuttering, with "noted decreased dysfluencies" (*id.*). She also reported, however, that there had been "a noted regression since therapy services were suspended a few months ago" (tr. 810). Claimant spoke in sentences, however, and his behavior was typical and within normal limits (*id.*).

The evaluators observed phrase repetition, part-and-whole-word repetition, initial sound repetition, prolongation, blocking, and facial tension/grimaces in approximately fifty-five percent of utterances at the beginning of connected speech (tr. 811). "Results of standardized assessment, parent report, and clinician observation indicate[d] that [Claimant] [met] diagnostic criteria for Childhood Onset Fluency Disorder (F80.81)" (*id.*). The evaluators "recommended that he receive skilled speech-language services in order to address these deficits and facilitate

improvement in these areas to a level more commensurate with that of his age-matched peers" (*id.*).

On March 15, 2018, Claimant again saw Haley Pope to work on handwriting (tr. 813). Claimant was cooperative and active and spoke in sentences (*id.*). His attending skills were within normal limits, given redirection (*id.*). His social interaction also was within normal limits, as was his response rate, cooperation, and emotional regulation (*id.*). Ms. Pope indicated Claimant's behavior was typical (*id.*). She noted delays in the areas of visual motor skills, fine motor coordination, visual perception, handwriting legibility, core strength and seated posture, primitive reflex integration, and shoe tying, which she opined could affect Claimant's ability to independently and successfully participate in school, home, and community environments (tr. 814). She recommended continued occupational therapy (*id.*).

Shortly thereafter, on April 2, Krystal Bittar, Psy.D., prepared a Confidential Treatment Summary, noting that during the initial intake interview on February 13, 2018, Plaintiff advised Claimant "was exhibiting behaviors associated with his diagnosis of ADHD such as[] impulsivity, hyperactivity, difficulty following directions and following through on tasks" (tr. 917–18). Dr. Bittar indicated "Psychoeducation was provided to [Claimant] regarding child onset fluency disorder as we concluded that [Claimant] was experiencing significant anxiety related to his

stuttering" (tr. 917). The focus of treatment was on lowering anxiety related to social interaction (*id.*). Dr. Bittar also worked with Plaintiff and Claimant on their relationship and communication (*id.*).

During the course of Dr. Bittar's treatment of Claimant, Claimant "made improvements in his behavior with [his] mother," who reported during the fourth session "a decrease in disruptive behavior and increase in their time spent together" (*id.*). Dr. Bittar recommended that Claimant continue taking psychotropic medications as prescribed by his primary care physician and continue individual, family, and speech therapy (tr. 918).

The following day, on April 3, 2018, Plaintiff reported to Ms. Boothby that Claimant's medication worked in the morning but wore off in the afternoon and thus did not effectively control target behaviors all day (tr. 1000–01). Treatment notes indicated the bullying had become less severe (tr. 1001). Ms. Boothby increased the dosage of Vyvanse and discontinued Adderall (tr. 1002).

On May 24, 2018, Claimant saw Erin Peters, ARNP, for ADHD (tr. 1005). Plaintiff reported no change in hyperactivity with the change in medication (*id.*). Claimant reportedly still could not sit still and exhibited impulsive behavior (*id.*). On examination, ARNP Peters observed Claimant to be hyperactive, dancing, fidgety, and frequently interrupting but polite and compliant under redirection (tr.

1007).  ARNP Peters assessed ADHD, anxiety disorder, speech/language delay, and developmental dysgraphia and, because Claimant was to be on summer vacation, lowered the dosage of Vyvanse and prescribed a trial period of Intuniv (tr. 1007–08).

Approximately three months later, on August 28, 2018, Plaintiff reported controlled ADHD and anxiety (tr. 1009).  Plaintiff also indicated Claimant felt like his stutter had improved (*id.*).

On September 5, 2018, Claimant was suspended for excessive profanity while playing a game on the playground (tr. 468).  Also on September 5, occupational therapists Taylor Brown and Anitha Tate evaluated Claimant's fine motor skills (tr. 1018–23).  Claimant was cooperative and became distracted but was able to redirect (tr. 1018).  He tested in the first percentile for visual perception, in the zero percentile for motor coordination, and below or well below average for fine motor precision, integration, and control (tr. 1019).  The evaluators indicated the delays could impact Claimant's ability to participate independently and successfully in school, home, and community environments (tr. 1020).

On September 13, Jennifer Bartolotti and Sabrina Roper re-evaluated Claimant's speech "based on his spontaneous utterances and parental report" (tr. 1026).  Claimant spoke in sentences, and his attending skills, level of activity, social

interaction, response rate, cooperation, and emotional regulation were within normal limits (tr. 1025). Claimant demonstrated phrase repetition, part-and-whole-word repetition, initial sound repetition, prolongation, blocking, and facial tension/grimaces (tr. 1026). "Approximately 40–50% of his utterances contained one or more of the listed dysfluent speech characteristics" (*id.*). The evaluators noted Claimant had "reduce[d] dysfluencies in ~75% of utterances in connected speech" (*id.*). They diagnosed a stutter and recommended Claimant continue speech therapy (*id.*).

On September 14, 2018, the team responsible for Claimant's IEP "met to address possible decrease in direct service for speech therapy" and completed a change of placement form (tr. 1038). The team redirected services from consultation to coteach for reading and math (*id.*). According to the addendum, the "[t]eam also discussed concerns that [Claimant] [was] starting to display defiant behavior, i.e., not following directions, not completing assigned tasks, talking back when teachers redirect him to follow directions, continually talking especially when frustrated during inappropriate times despite teachers['] multiple instructions to stop talking" (tr. 1038).

On October 24, 2018, William Benet, Ph.D., Psy.D., conducted a psychological evaluation of Claimant (tr. 1046–49). Plaintiff reported to Dr. Benet

that Claimant, who was ten years old and a fifth-grader at the time, had symptoms of hyperactivity, impulsive behavior, marked inattention, stuttering, and oppositional defiant behavior at home and school (tr. 1047). Plaintiff advised Dr. Benet that when Claimant did not "get his way," he would "'get[] an attitude' and 'act[] like a spoiled brat'" (*id.*). Plaintiff indicated Claimant "ha[d] a couple of friends and [was] not very sociable" but enjoyed playing youth football and video games; he also performed chores, including "keeping his room clean and taking out the trash" (tr. 1047). Plaintiff advised that Claimant had taken ADHD medication the morning of the examination (tr. 1048).

Dr. Benet noted Claimant was "responsive and cooperative," with no fidgeting or restlessness (tr. 1046, 1048). Claimant's speech was "coherent and relevant, with mild stuttering" (tr. 1048). Claimant had "no difficulty understanding and responding to questions or sustaining a short conversation" (*id.*). His thinking was "organized and goal-directed with no thoughts of harming himself or others" (*id.*). His "[p]erceptions were accurate, without hallucinations or illusions"; his mood was euthymic; and his affect was congruent (*id.*). Claimant's immediate recall was average for his age—he could remember five digits forward and three digits backward (*id.*). His delayed recall was good—he could remember three out of three objects after a three-minute interference task (*id.*). His long-term memory was

intact, and his fund of knowledge was average (*id.*). Dr. Benet found Claimant's verbal reasoning above average based on Claimant's ability to describe similarities between different pairs of objects, activities, and concepts, and he assessed Claimant's general intellectual ability as average (tr. 1048).

Dr. Benet found that Claimant's general presentation, mental status examination, and history suggested an attention-deficit/hyperactivity disorder, with mild stuttering and oppositional defiant behavior. Claimant's cognitive function was intact, however, and his intellectual ability was average, with no impairment of memory or verbal reasoning (tr. 1048). In Dr. Benet's opinion, "[i]n comparison to other children in his age group who are not impaired, [Claimant] should be able to acquire and use information[] but is likely to have moderate to marked difficulty attending and completing tasks and interacting and relating with others" (*id.*). Dr. Benet diagnosed ADHD, oppositional defiant disorder, and childhood-onset fluency disorder and assessed less than marked limitations in acquiring and using information, moving about and manipulating objects, and self-care and marked limitations in attending and completing tasks, interacting and relating with others, and health and physical well-being (tr. 1048–49).

On February 19, 2019, Mira Patel, OT, conducted an occupational therapy progress evaluation (tr. 1050–58). Ms. Patel concluded Claimant's visual motor

integration score was equivalent to that of a child four and one-half years old (tr. 1051). Fine motor precision, integration, and manual control were below or well-below average (*id.*). According to Ms. Patel, "[a]lthough [Claimant] ha[d] made progress, he continue[d] to show deficits with unintegrated reflexes, visual perceptual skills (visual sequential memory, figure-ground, form constancy, etc.), visual motor skills, postural strength, bilateral coordination, fine motor precision (folding, staying within the line), and handwriting skills," which she opined affected Claimant's ability to independently function within school, home, and community environments (tr. 1052). Ms. Patel indicated Claimant's sustained attention was improved so that he could participate in thirty-minute tasks, his visual perceptual skills were improved but still delayed, and his general social skills were still delayed (tr. 1052, 1057–58). She recommended continued occupational therapy (tr. 1058).

On February 25, 2019, Claimant saw Ms. Van Boven for speech-language therapy (tr. 1059). Again, Claimant spoke in sentences, and his attending skills, level of activity, social interaction, cooperation, and emotional regulation were typical and within normal limits (*id.*). Ms. Van Boven found disfluencies in approximately ten percent of syllables when measuring spontaneous speech during conversation (tr. 1060). She found Claimant's articulation/phonology, expressive language, and receptive language to be within normal limits and his fluency to be

mildly impaired, stating Claimant "continue[d] to exhibit a mild Fluency Disorder (F80.81) characterized by part-and whole-word repetition, initial sound repetition, prolongation, blocking (infrequent), and facial tension/grimaces (tilting head back and rolling eyes)" (*id.*).   She recommended Claimant continue fluency treatment (*id.*).

As indicated above, the ALJ conducted two hearings in this matter—on October 1, 2018, and May 20, 2019.  Claimant testified at both hearings.  At the first hearing, when Claimant was ten years old and in the fifth grade, Claimant testified he had to leave Terwilliger Elementary School the year before the hearing because he got into a fight with another student and was "yelling and being disrespectful" (tr. 82, 86).  He said he went to another school, Archer, for a year, and then returned to Terwilliger (tr. 83).

Claimant had problems at Archer as well (tr. 84).  He testified he got into a fight on the bus when "everybody kept on picking on [him]" and one student made him mad (*id.*).  When asked if he spoke daily to the principal or dean of Archer about his behavior, Claimant responded "[k]ind of, it was kind of, because they wanted to know how I was doing every day" (*id.*).  Claimant confirmed the school "tried to keep [him] on the straight and narrow" but that he "still had behavioral issues" (*id.*).  Claimant said his favorite subject was physical education and his least favorite

subjects were math and art (*id.*).  He did not enjoy art because he was not good at it and did not like to "make anything" (*id.*).

Claimant testified medication helped with ADHD by calming him down and helping him focus (tr. 85).  He also said he was unable to watch an entire television show without getting out of his seat because he did not like to sit in one place and preferred to move around (tr. 86).  He said he sometimes cleaned his bathroom and took out the trash but that his mother had to tell him "lots" of times to complete his chores before he would do so (*id.*).

When asked about his grades, Claimant testified he made As, Bs, and Cs and had never failed a grade (tr. 87).  Claimant said he played flag football and caught the ball approximately nine or ten times during the last season he played (tr. 89).  Claimant recalled an additional occasion on which he was suspended from school— for one day—for leaving the cafeteria without permission to use the restroom (tr. 90).  He also confirmed he got into trouble at the Boys and Girls Club for swearing, pushing, and fighting (*id.*).

Plaintiff testified at both hearings as well.  At the October 1 hearing, Plaintiff said Claimant got into trouble at school for swearing, fighting, and disruptive behavior (tr. 91).  She confirmed Claimant was suspended from school for a day for leaving the cafeteria without permission and yelling at a teacher (*id.*).  She also said

Claimant was bullied at school because of his stutter and responded poorly (tr. 92).

At home, Plaintiff said, Claimant throws stuff and hits walls (tr. 94).   Plaintiff

testified she and Claimant went to counseling to address Claimant's problems and

that Claimant also attended speech therapy (tr. 92).

At the hearing on May 20, 2019, Olin Hamrick, Ph.D., testified as a

psychological expert (tr. 102).   Dr. Hamrick noted Claimant had been diagnosed

with ADHD, anxiety, and possible oppositional defiant disorder, which Dr. Hamrick

opined could be depression related to bullying (tr. 102–03).   Dr. Hamrick testified

there was "evidence of likely learning disorder although it's not in the diagnosis.

Not in the record as a discreet diagnosis" (tr. 103).   He also testified there was

"evidence of sensory motor developmental issues, mainly affecting his handwriting

and possibly speech," which Dr. Hamrick opined was "consistent with [a learning

disability] diagnosis as well" (*id.*).

The ALJ asked Dr. Hamrick if the conditions met or equaled the Listings (*id.*).

Rather than address the question, Dr. Hamrick discussed his review of Claimant's

"history," clarifying he was "looking at undoing the cessation here as far as [he

could]" (*id.*).   Dr. Hamrick explained,

> I've focused on the evidence since the date of the cessation which is
> back in August of 2017.   At that time, the decision was made that he
> had improved enough medically that he no longer met the listings.   Up

to that time, he was seen as meeting the social domain on the concentration, persistence, and pace domain. Rather he was seen as meeting the listings for ADHD based on marked limitations in those two areas of the six childhood domains that we were using back then. So then coming on up through the record since that time, he did show some evidence of improvement, of course, by the way, leading to the cessation. But since then, it appears to me that the record supports a continuation of difficulties related to ADHD as well as the other impairments that I mentioned already, the problems with his handwriting and his social difficulties and reacting to bullying. And so, looking at the record overall, Your Honor, just to get to the bottom line, I think that there is evidence that this child continued to meet the listings for 12.04—excuse me—112.11 and 112.06. 112.06 is the diagnosis of anxiety and I think along with that, there's depression as well which would be on 112.04. But I don't know how you want to handle my suggesting diagnoses. If you want me to just withdraw that, I will, and just stick with what's in the record, which is 112.06 and 112.11. I think that the six domains still are marked on attending and completing tasks, and interacting and relating with others. And on the four domains that we've been using since January 2017, I believe there's a marked limitation on interact with others, and on concentrate, persist or maintain pace. Since the cessation, the child has had some continuing disciplinary problems at school. He's been suspended from the bus several times. He also had at least a one-day suspension for an episode of acting out in the classroom and the problem with bullying and that is related to his speech issue, which I'm not qualified to give you an opinion about other than to indicate that it's there in the record. I'm not a speech consultant. But he's been bullied as a reaction to his speech issue and I think that there is still enough evidence in the record to support a marked limitation on interacting with others and concentration and persistence and pace.

(tr. 103–05). The ALJ twice attempted to clarify that Dr. Hamrick intended to refer

to attending and completing tasks rather than concentration, persistence, and pace,

which Dr. Hamrick confirmed, testifying that, in his opinion, Claimant had marked

limitations in attending and completing tasks and interacting and relating with others and less than marked limitations in the other four domains (tr. 105).

The ALJ asked Dr. Hamrick if there was evidence Claimant's ADHD had improved and Claimant was doing better in school on medication (tr. 106). Dr. Hamrick confirmed Claimant was doing better on medication—"no doubt about that"—but added Claimant "still ha[d] issues though," referring to ADHD, as well as allergies, the latter of which Dr. Hamrick testified were impacting Claimant's sleep, which "would make him more susceptible to both angry, acting out, as a manifestation of childhood depression, and it would also lower his threshold for ADHD symptoms" (*id.*).

The ALJ then questioned Plaintiff. The ALJ pointed out that Claimant was making As, Bs, and Cs in school, and Plaintiff responded, stating "[i]t's not his grades. It's mostly his behavior." (tr. 107). Plaintiff acknowledged Claimant could focus when taking medication and that his grades were okay (*id.*). Dr. Hamrick then interjected, adding that Claimant still had "an IEP as well and accommodations in the classroom and some pullout for speech therapy and help with his written expression" (*id.*). The ALJ asked Dr. Hamrick the reason he opined Claimant had marked limitation in attending and completing tasks when Plaintiff was making As, Bs, and Cs in school (*id.*). Dr. Hamrick replied, "I don't believe that [Claimant's]

A's, B's and C's [were] based on the criteria for a child who would not have a special ed IEP" (*id.*).  In other words, Dr. Hamrick was "not convinced that [Claimant's] grades [were] based on the same standards as if [Claimant] did not have the IEP" (tr. 107–08).

The ALJ said he was not sure he understood Dr. Hamrick's testimony, and Dr. Hamrick said he was not sure he could explain it (tr. 108).  Dr. Hamrick then testified as follows:

> Looking at the school records, it appeared to me that he was not given the same level of credit for his grades as would be expected if he were not on a special ed IEP.  And I may be wrong about that, but his standardized test scores were close to average, I believe, actually above average in one domain, which I think was math.  But I still believe that he would be likely to have difficulties with concentration, persistence and pace.  I didn't say that he would be marked on understand, remember, or apply information, I don't think.  If I did, I misspoke.  I'm talking about attending and completing tasks.

(*id.*).  When asked again to explain the reason he considered Claimant to have a marked limitation in attending and completing tasks, Dr. Hamrick responded,

> [b]ecause he is still on medication for ADHD and in spite of the medication, he still does have some evidence of issues with attention and concentration.  He also still has issues with overactivity at times and I believe that his irritability and his angry acting out when he's bullied is in part related to his ADHD as well as anxiety and depression.

(*id.*).

The ALJ asked Dr. Hamrick if it was normal for a child to become upset by being bullied (*id.*). Dr. Hamrick replied, "[i]t is, but I don't think it's really normal to jump into a fight about it" (*id.*). The ALJ asked Dr. Hamrick to explain his response, and Dr. Hamrick testified "there are more productive ways of dealing with it and also I believe he's carrying along with himself some awareness of his speech issues and is probably more likely to attribute aggression and bullying to other children's behavior than they really intend" (tr. 109).

After some back-and-forth with Plaintiff's counsel regarding the issue, the ALJ again asked Dr. Hamrick if he thought it was normal for a child—a boy, in particular—to get angry and even "hit back" when being bullied (tr. 115). Dr. Hamrick responded,

> [i]t's normal, Your Honor, just as is depression and/or anxiety. All those negative emotions are normal. Usually what happens is that there's an underlying depression and children, particularly boys, often express depression in the form of anger and irritability and a low threshold for acting out. But the underlying issue there is depression and then also anxiety

(tr. 115). The ALJ clarified he was not referring to depression or anxiety and asked Dr. Hamrick whether it would be typical for a "normal boy with no psychological issues," who was bullied on the bus, "to get angry and even fight?" (*id.*). Dr.

Hamrick responded that while it may be normal to get angry and even fight, at least at the beginning,

> [i]f it becomes a pattern . . . and if the child becomes hypersensitive to negative criticism from his peers, and if his peer relationships are impaired because of that, and if there's an underlying cause leading to a sense of self-consciousness or shame, such as a language disorder, a speech disorder, that's not—all that's not normal

(tr. 115–16).

## DISCUSSION

"An individual under the age of eighteen is considered disabled if he or she has 'a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Romero on behalf of K.S.Q. v. Saul*, No. 6:19CV02381-ACC-JRK, 2021 WL 664132, at *2 (M.D. Fla. Feb. 3, 2021), *report and recommendation adopted sub nom. Romero v. Comm'r of Soc. Sec.*, No. 6:19cv2381-ORL22DCI, 2021 WL 662236 (M.D. Fla. Feb. 19, 2021) (quoting 20 C.F.R. § 416.906 and citing 42 U.S.C. § 1382c(a)(3)(C)(i)). "The C.F.R. contains a Listing of Impairments ['the Listings', found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d

1276, 1278 (11th Cir. 2004) (citing 20 C.F.R. § 416.925(a)). "For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered 'marked and severe.'" *Id*. at 1278–79 (citing 20 C.F.R. § 416.925(a) ("The Listing of Impairments describes . . . impairments . . . for a child that cause [] marked and severe functional limitations.")).

"A child's impairment is recognized as causing 'marked and severe functional limitations' if those limitations 'meet[], medically equal[], or functionally equal[] the [L]istings.'" *Id*. at 1279 (citing 20 C.F.R. §§ 416.911(b)(1), 416.902, 416.924(a)). "A child's limitations 'meet' the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations 'medically equal' the limitations in the Listings if the child's limitations 'are at least of equal medical significance to those of a listed impairment.'" *Id*. (citing 20 C.F.R. § 416.926(a)(2)). "[E]ven if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings." *Id.*

"In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities" in the following six domains:

    (i)    Acquiring and using information;
    (ii)   Attending and completing tasks;
    (iii)  Interacting and relating with others;
    (iv)  Moving about and manipulating objects;
    (v)   Caring for oneself; and
    (vi)  Health and physical well-being.

*Id*. (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." *Id*. (citing 20 C.F.R. §§ 416.926a(g)–(l)). The ALJ "must compare how appropriately, effectively and independently the plaintiff performs activities compared to the performance of other children of the same age who do not have impairments." *Daniel ex rel. J.K.D. v. Astrue*, No. CV 12-CV-2188-S, 2013 WL 444251, at *3 (N.D. Ala. Jan. 31, 2013).

"To functionally equal the listings, the plaintiff's impairment or combination of impairments must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." *Id*. (quoting 20 C.F.R. § 416.926a(a) and (d)). "In assessing whether the plaintiff has 'marked' or 'extreme' limitations, the [ALJ] must consider the functional limitations from all medically determinable

impairments, including any impairments that are not severe." *Id.* (quoting 20 C.F.R. § 416.926a(a)). In addition, "[t]he [ALJ] must consider the interactive and cumulative effects of the plaintiff's impairment or multiple impairments in any affected domain." *Id.* (citing 20 C.F.R. § 416.926a(c)).

A claimant has a "marked" limitation if his "impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A claimant has an "extreme" limitation when his "impairment(s) interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). When determining how effectively a child functions, the ALJ may consider various factors, including whether the child needs help from other people, medication, or a structured or supportive setting to perform daily activities. *See* 20 C.F.R. § 416.924a. The regulations recognize that "[w]ith treatment or intervention," a claimant "may not only have [his] symptoms or signs reduced, but [he] may also maintain, return to, or achieve a level of functioning that is not disability." 20 C.F.R. § 416.924a(9)(iii). Stated differently, "[t]reatment or intervention may prevent, eliminate, or reduce functional limitations." *Id.*

Plaintiff bears the burden of proving Claimant is disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(H)(i); 20 C.F.R.

§ 416.912(a); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "In cases for termination or cessation of benefits," however, "the burden is on the Commissioner to prove that the [child] is no longer disabled as of the cessation date because the [child] had experienced medical improvement." [5] *Romero on behalf of K.S.Q.*, 2021 WL 664132, at *2 (internal marks omitted) (citing *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991); *Huie v. Bowen*, 788 F.2d 698, 705 (11th Cir. 1986)).

"In deciding whether an individual under the age of eighteen is no longer disabled, an ALJ follows the three-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations")." *Id.* "This sequential inquiry asks, in substance, whether (1) the child has experienced medical improvement; (2) the child's impairment(s) at the time of the most recent favorable decision still meet or medically equal the Listing they met or equaled at that time; and (3) the child's current impairment(s) (including any impairments not present at the time of the most recent favorable decision) are disabling under 20 C.F.R. § 416.924." *Id.* (citing 20 C.F.R. § 416.994a(b)). "At step three, the ALJ must determine as appropriate

---

[5] The Commissioner erroneously states the burden of proof is on Plaintiff to demonstrate continued disability (*see* ECF No. 6 at 22).

whether the child has a severe impairment or combination of impairments and whether the impairment(s) meet, medically equal, or functionally equal any of the impairments set forth in the Listings." *Id.* (citing 20 C.F.R. § 416.994a(b)(3); 20 C.F.R. § 416.924(a)–(d); *Shinn ex rel. Shinn*, 391 F.3d at 1278–79 (setting forth evaluation process for children); *Banks for Hunter v. Comm'r, Soc. Sec. Admin.*, 686 F. App'x 706, 712 (11th Cir. 2017); *Beavers v. Soc. Sec. Admin., Comm'r*, 601 F. App'x 818, 820–21 (11th Cir. 2015)).

Here, at step one, the ALJ found that "as of August 14, 2017, there had been a decrease in medical severity of the impairments present at the time of the CPD" (tr. 15). Specifically, the ALJ found "[t]he evidence of record establishe[d] that the claimant had improvement in attending and completing tasks and in interacting and relating with others" (*id.*). In support his findings in that regard, the ALJ noted that in June 2017, Plaintiff reported Claimant's medication was effective and Claimant had no behavioral problems (*id.*). The ALJ further observed that Claimant's teacher, Ms. Teele, noted Claimant had no more than an obvious problem in acquiring and using information, attending and completing tasks, and interacting and relating with others (*id.*). "In addition, Ms. Teele indicated that the claimant took medication for his ADHD and that it was effective" (*id.*). School records from the prior year showed Claimant had no disciplinary reports or behavioral problems and that while Claimant

had an IEP, as of the February 2017 meeting, his grades were satisfactory, and his behavior was not an impediment to his learning (tr. 15).

As set forth above, at a speech-language evaluation in July 2017, Ms. Dixon-Wood indicated Claimant was distractible, restless, and quiet but also cooperative and able to regulate his emotions (tr. 15). Moreover, "[w]hile he tested below average in several areas, the claimant's speech was 100% intelligible to an unfamiliar listener on a known topic and 98% on an unknown topic" (*id.*). The following month, a private speech therapist indicated Claimant had only a moderate disfluency limitation (*id.*).

As the ALJ further observed, "treatment records from the University of Florida Child Development and Behavioral Health Clinic [from November 28, 2018] show that the claimant's medications were effective with no side effects" (tr. 15). And Claimant "was consistently noted to have normal behavior in the exam rooms" (*id.*).[6] In addition, at the November 28 appointment, Plaintiff reported Claimant was

---

[6] As Plaintiff points out, in a section addressing resolution of inconsistencies in evidence, SSR 09-2p recognizes a "well-known clinical phenomenon that children with some impairments (for example, AD/HD) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a CE." SSR 09-2p. The ruling also recognizes that the Commissioner often is "able to resolve the issue with the evidence in the case record because most of the evidence or the most probative evidence outweighs the inconsistent evidence and additional information would not change the determination or decision." *Id.* Notably, the ruling explains that an inconsistency may be immaterial in an unfavorable determination or decision when resolution of the inconsistency would not affect the outcome—for example, "if there is inconsistent evidence about

doing well overall on his current medication regimen and his "target behaviors [were] well controlled through out [sic] the school day" (tr. 57). Plaintiff reported Claimant was "having difficulty participating in speech and OT due to his hyperactivity and needing to be redirected often," but Claimant's mood and affect at the appointment were within normal limits (tr. 57–58).

At a subsequent appointment on February 7, 2019, Plaintiff again reported Claimant was doing well on his medication and that she had no academic or behavioral concerns (tr. 73). Plaintiff reported Claimant was responding well to therapy and his stutter had improved (*id.*). The provider indicated Claimant had no noticeable stutter, no unusual behavior, and normal mood and affect (tr. 74). The ALJ thus concluded medical improvement had occurred as of August 14, 2017 (tr. 15).

The ALJ found at step two that since August 14, 2017, Claimant's impairments at the time of the CPD had not functionally equaled the Listings (tr. 16). The ALJ determined Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms but that the statements concerning the intensity, persistence, and limiting effects of the claimant's

---

a limitation in an activity, but no evidence supporting a rating of 'marked' limitation of a relevant domain." *Id.*

symptoms were not entirely consistent with the objective medical and other evidence (*id.*). In so finding, the ALJ noted that at the hearing on October 1, 2018, Plaintiff testified Claimant was making good grades in school and playing football (tr. 16). She reported behavioral problems in response to bullying and that Claimant had been suspended from riding the bus as a result thereof but that since Claimant stopped riding the bus and started playing sports, his behavior had improved (*id.*).

"In terms of the claimant's alleged limitations," the ALJ found "the evidence shows that the claimant's impairments were fairly well controlled on his current treatment regimen" (tr. 16). The ALJ noted Claimant "experienced some difficulty controlling his symptoms from October 2017 through May 2018," which required medication adjustments," but the record also shows Claimant was "compliant with redirection, polite and cheerful" (tr. 16–17). "Furthermore, despite the[] disciplinary issues, the school records show that [Claimant] had passing grades during this period with the exception of fourth grade math" (tr. 17). And he was promoted to fifth grade (*id.*). Moreover, although Claimant had an IEP, there was "no indication that his behavior impeded his or others [sic] ability to learn"; in fact, the evidence shows the contrary (*id.*). And Claimant received therapy for his communication needs— speech and handwriting (*id.*). He also received psychotherapy in 2018, after the fourth session of which Plaintiff reported improved behavior (*id.*). Due to

scheduling conflicts, Claimant went a period of time without psychotherapy, but he resumed therapy in September 2018 (*id.*).

Treatment records from speech-language and occupational therapy show Claimant had some limitations in acquiring and using information and attending and completing tasks, but they also show improvement with only intermittent sessions (tr. 17). And while Claimant was distractible at times, the therapists were able to redirect him (*id.*).

With regard to Dr. Benet's opinion, as the ALJ observed, Dr. Benet indicated he had reviewed records from Claimant's occupational therapist and pediatrician (tr. 17). During the evaluation, Plaintiff reported to Dr. Benet that Claimant's biggest problem was hyperactivity (*id.*). On examination, however, Claimant was quiet and cooperative and made good eye contact (*id.*). His speech was coherent and relevant with only mild stuttering (*id.*). Claimant had no difficulty understanding and responding to questions or sustaining a short conversation (*id.*). His memory was intact and average for his age (*id.*). His verbal reasoning ability also was intact and above average (*id.*). Dr. Benet nevertheless opined Claimant would be likely to have moderate to marked limitations in attending and completing tasks, interacting and relating with others, and health and physical well-being (tr. 17).

The ALJ found Dr. Benet's opinion not consistent with or supported by his own examination findings or the evidence of record as a whole (tr. 17, 19).  In addition to the above, the ALJ pointed to the fact that Dr. Benet noted Claimant had taken medication prior to the examination, which the ALJ found provided further support for a finding that Claimant's symptoms were well-controlled with medication (tr. 19).  The ALJ concluded the objective findings did not support marked limitations, except in interacting and relating with others (*id.*).

With respect to Dr. Hamrick's testimony, the ALJ found the testimony "less persuasive" because it was "speculative" in that Dr. Hamrick "stated that some of the diagnoses may not be correct and that while he [was] not supposed to diagnose impairments that depression is what stood out to him" (tr. 18).  The ALJ noted that while Dr. Hamrick "had the opportunity to review the evidence, he did not have the opportunity to personally examine the claimant" (*id.*).

As the ALJ observed, "Dr. Hamrick testified that the claimant did show medical improvement in August of 2017"; he nevertheless testified "that the claimant continued to have marked limitation[s] in interacting and relating with others and in attending and completing tasks" (tr. 18).  Dr. Hamrick "stated that he based this off difficulty with handwriting and [Claimant's] disciplinary issues in 2017 and 2018" and "that the claimant's medication improved his symptoms but that

he continued to have issues" (*id.*).  Dr. Hamrick also opined "that the claimant's grades may not be based on the same grading scale as a student who did not have a special education IEP," which the ALJ found "speculative as the education records do not indicate the claimant is on a different grading scale" (tr. 18–19).

As the ALJ noted, Claimant's IEP allowed for accommodations in preferred seating, oral instructions, and extended time on tests, but there was "no indication [Claimant] [was] on a different grading scale" (tr. 19–20).  In fact, Claimant's IEP at the time of the hearing showed he was in regular classes 80% of the day and participated in general statewide assessments (tr. 18).  "Furthermore, each IEP Report included in the evidence clearly indicates that . . . the claimant's behavior does not impede his . . . learning or the learning of others" (*id.*).  The ALJ thus also found Dr. Hamrick's testimony "not fully consistent with or supported by the evidence of the record as a whole" (*id.*).

According to the ALJ, "[a]s a whole, the objective evidence, including medical and school records, only support a finding of [a] marked limitation[] in interacting and relating with others" (tr. 18).  The ALJ acknowledged that from October 2017 through June 2018, Claimant had behavioral problems stemming from bullying and required several medication adjustments, "which took some time to be effective" (*id.*).  The principal of Claimant's school "completed a letter in January

of 2018, in which she reported that the claimant was not taking his medication any longer because of a problem with Medicaid," but, as the ALJ observed, Claimant "never reported any difficulty obtaining the medication to the Shands Behavioral Health Clinic" (tr. 18). Notably, the principal indicated that when Claimant took his medication, it had "a positive impact on his behavior and concentration" (*id.*).

After June 2018, Claimant's "symptoms appear[ed] to stabilize as he only had one disciplinary issue reported in the 2018–2019 school year" (tr. 18). Moreover, "in the first quarter of the 2018–2019 school year, the claimant had passing grades in all subjects" (*id.*). The ALJ thus found that "when the claimant takes his medication, his symptoms of ADHD and oppositional defiant disorder are well controlled," citing, as an example, the fact that although therapists observed Claimant to be distractible at times, they also noted he was easily redirected, and he met his goal for sustained attention at occupational therapy (*id.*).

The ALJ found the opinions of state agency medical and psychological consultants, including those of Drs. Eisenberg and Sadovnik, persuasive in terms of Claimant's medical improvement (tr. 19). Both Dr. Eisenberg and Dr. Sadovnik concluded Claimant had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others, and no limitations in the other domains (*id.*). The ALJ found the findings

supported by and consistent with the evidence available at the time of their review, including the teacher questionnaire Ms. Teele completed indicating Claimant had no more than an obvious problem in any area of functioning and, most significantly, that Claimant took medication that was effective in controlling his symptoms (tr. 19). The ALJ also found the findings consistent with Claimant's pediatric treatment records, "which generally show his ADHD was well controlled on the prescribed medication up to September of 2017" (*id.*). The ALJ acknowledged the "hearing level evidence" established "greater limitation in interacting and relating with others" and that Claimant had numerous disciplinary referrals while riding the bus and several incidents at school during the 2017–2018 school year (*id.*). The ALJ thus found the evidence supported a finding of a marked limitation in interacting and relating with others (*id.*).

Finally, the ALJ noted "[s]choolteachers render opinions based on first-hand, actual observations of children, in both academic and social settings" and thus are "in the unique position of being able to assess a child's ability to acquire and use information, attend and complete tasks, interact and relate with other students and teachers, move and manipulate objects, as well as care for themselves, in comparison to the way other children of the same age function in identical environments" (tr. 20). Accordingly, the ALJ found the teacher questionnaire Ms. Teele completed to

be persuasive, along with a letter from Stella Arduser, the principal of Archer Elementary School, in which Ms. Arduser noted Claimant's behavior was significantly improved when Claimant took medication (tr. 20). In the letter, dated January 17, 2018, Ms. Arduser described Claimant as bright, inquisitive, and likeable (tr. 421). In advocating for Claimant to receive proper medical treatment, apparently during a time Claimant was not taking his prescribed medication, Ms. Arduser stated that Claimant's medication "is so important because it has a positive impact on his concentration" and "place[s] him on an equal level playing field to his peers" (*id.*).

The ALJ then proceeded to thoroughly discuss each domain, setting forth his reasons for assessing the limitations he did. With regard to attending and completing tasks, the ALJ noted the "domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities" (tr. 21). "The regulations provide that a school-age child without an impairment should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments" (*id.*). "The child should be able to concentrate on details and not make careless mistakes in his work (beyond what would be expected

in other children the same age who do not have impairments)" (*id.*).  "The child

should be able to change activities or routines without distraction, and stay on task

and in place when appropriate" (*id.*).  "The child should be able to sustain attention

well enough to participate in group sports, read by himself, and complete family

chores" (*id.*).  "The child should also be able to complete a transition task (e.g., be

ready for the school bus, change clothes after gym, change classrooms) without extra

reminders and accommodation" (tr. 21) (citing 20 C.F.R. 416.926a(h)(2)(iv)).

> Social Security regulation 20 CFR 416.926a(h)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods.  In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain.  Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; or (v) requires extra supervision to remain engaged in an activity.

(*id.*).  The ALJ determined that "[s]ince August 14, 2017, the claimant has had less

than [a] marked limitation in attending and completing tasks as a result of the

impairments present at the CPD" (*id.*) (emphasis in original).

The ALJ acknowledged Claimant's ability to concentrate and focus was limited due to ADHD (tr. 21). As the ALJ observed, however, "the evidence generally shows that when [Claimant] [was] compliant with his medication, he [was] able to focus and concentrate on his work" (*id.*). Indeed, Claimant's "third grade teacher and the principal of his school both noted that he had improved attention and concentration when he took his medication" (*id.*). "Similarly, the claimant's mother consistently reported that his medication was effective to the Shands Behavioral Health Clinic" (tr. 21). "While Dr. Benet and Dr. Hamrick both opined that the claimant had marked limitations in this functional area, . . . their opinions are not consistent with the evidence of record as a whole" (tr. 22). Although "the claimant had been noted to be sidetracked and interrupt others, as a whole, the evidence shows that he respond[ed] favorably to his prescribed treatment plan" (*id.*). Claimant's "grades and continued matriculation through school are evidence that the accommodations provided for in his IEP and his prescribed treatment [were] effective" (*id.*). The ALJ thus found Claimant had "less than [a] marked limitation in this functional area" (*id.*).

The ALJ found Claimant had a marked limitation in only one domain, interacting and relating with others. As the ALJ explained, "[e]vidence of limitation in this area refers to the claimant's ability to relate to others age-appropriately at

home, at school, and in the community" (tr. 26). "Examples of interacting with others include engaging in interactive play, cooperating with others, asking for help when needed, initiating and maintaining friendships, handling conflicts with others, stating own point of view, initiating or sustaining conversation, understanding and responding to social cues, responding to requests, suggestions, criticism, correction, and challenges, and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness" (*id.*).

The ALJ found "[t]he evidence shows that the claimant continued to have difficulty keeping social interactions free of excessive irritability and argumentativeness" (tr. 26). "The education records show that he was suspended from the bus for fighting and using profanity on multiple occasions during the 2017–2018 school year" (*id.*). "In addition, he displayed similar behavior at school occasionally[] but apparently did not have access to  medication during some of this school year" (*id.*). Claimant, however, was "usually regarded as cooperative with normal behavior at his doctor's visits," and although he "was noted to be distractible at time[s] with his occupational therapist[,] . . . he responded to redirection" (tr. 26–27). "Even Dr. Benet noted that the claimant was quiet and cooperative during the consultative examination" (tr. 27).

At step three, the ALJ found that since August 14, 2017, Claimant had not had an impairment or combination of impairments that met, medically equaled, or functionally equaled one of the Listings (tr. 25–27).  In so finding, the ALJ noted that "no treating or examining physicians reported findings that satisfy the criteria of any of the listed impairments," which is "supported by the findings of the State agency medical consultant, who reviewed the evidence of record and concluded that the claimant's impairments do not meet or equal a listed impairment" (tr. 26).  The ALJ reiterated his findings regarding Claimant's limitations and concluded that "[b]eginning on August 14, 2017, the claimant's impairments have not resulted in either 'marked' limitation in two domains of functioning or 'extreme' limitation in one domain of functioning (tr. 28).  Consequently, the ALJ concluded, Claimant's impairments have not functionally equaled the listings as of August 14, 2017" (tr. 26–28)

Although the evidence of record shows Claimant had impairments stemming from ADHD and a speech and language disorder, substantial evidence in the record supports the ALJ's finding that Claimant's impairments did not meet, medically equal, or functionally equal a listed impairment as of August 14, 2017, because Claimant did not have marked limitations in at least two domains or an extreme

limitation in any one of the six domains since the CPD. The ALJ thus did not err in finding Claimant no longer disabled as of that date.

CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence in the record and application of proper legal standards.[7]  *See Carnes,* 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). The Commissioner's decision, therefore, should be affirmed.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the decision of the Commissioner be **AFFIRMED**.

2.    That judgment be entered accordingly and the clerk be directed to close the file.

At Pensacola, Florida, this 7th day of December 2021.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[7] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore*, 405 F.3d at 1208.

Case No.: 1:20cv118/AW/EMT

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**